In re LONE STAR INDUSTRIES, INC., CONCRETE RAILROAD CROSS TIES LITIGATION.

This Document Relates to All Cases.

MDL No. 827.

United States District Court, D. Maryland.

Oct. 18, 1991.

**208**

Stephen H. Sachs, Wilmer, Cutler & Pickering, Washington, D.C., for Amtrak.

Thomas L. Samuel, Whiteford, Taylor & Preston, Baltimore, Md., for CSX.

Jonathan Sinnreich, Sinnreich, Wasserman & Grubin, New York City, for Metro North.

James J. Myers, Gadsby & Hannah, Boston, Mass., for MBTA.

Max H. Lauten, Kramon & Graham, Baltimore, Md., John M. Quitmeyer, Rogers & Wells, New York City, for Lone Star.

Richard M. Bernstein, Hoyle, Morris & Kerr, Philadelphia, Pa., Robert E. Powell, Smith, Somerville & Case, Baltimore, Md., for LaFarge.

## MEMORANDUM AND ORDER

ALEXANDER HARVEY, II, Senior District Judge.

In this multidistrict litigation, a number of civil actions have been coordinated and consolidated for pretrial purposes pursuant to 28 U.S.C. § 1407. Since the Transfer Order of the Judicial Panel on Multidistrict Litigation dated February 8, 1990, various pretrial proceedings in these cases have been held in this Court, and, pursuant to Pretrial Order No. 2, the parties have heretofore engaged in extensive discovery.

Both plaintiffs and defendants have now filed motions for partial summary judgment, all of which are pending before the Court for decision. There are four pending suits which have been brought by railroad entities against Lone Star Industries, Inc. (hereinafter "Lone Star") and its subsidiary San–Vel Concrete Corporation (hereinafter "San–Vel"), each of which seeks a recovery for losses incurred by the premature cracking and deterioration of concrete railroad cross ties purchased by the railroads from Lone Star.[1] Named as third-party defendants in each of these four suits are LaFarge Corporation and two of its subsidiaries, LaFarge Canada, Inc. and Northeast Cement Company, Inc. (hereinafter referred to collectively as "LaFarge"). The third-party complaints allege that the cement furnished by LaFarge to Lone Star was defective.

The plaintiff railroads have all moved for partial summary judgment on the issue of liability claiming that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law as to some of the claims which they have asserted. Lone Star has also filed motions seeking partial summary judgment in its favor as to various claims asserted by the railroads. Voluminous memoranda and numerous exhibits, deposition excerpts and affidavits have been filed by the parties both in support of and in opposition to the pending motions. Oral argument has been heard in open Court. For the reasons to be stated, plaintiffs' motions for partial summary judgment will be denied, and defendants' motions for partial summary judgment will be granted in part and denied in part.

### I

#### Facts

These actions arise as a result of the premature cracking and deterioration of some 500,000 concrete railroad cross ties purchased from Lone Star by various railroad entities between 1983 and 1988. The concrete ties purportedly had a service life of 50 years. However, in August of 1988, National Railroad Passenger Corporation (hereinafter "Amtrak") advised Lone Star that concrete ties sold to it by Lone Star had exhibited signs of cracking and deterioration. Thereafter, Lone Star informed its

---

1. A fifth consolidated suit was brought by Lone Star and San–Vel against LaFarge. Civil No. H–89–3343.

other customers of the possibility of deterioration and, upon performing track inspections, these customers determined that the ties which had been sold to them were deteriorating as well.

After the deterioration of the ties was discovered, several civil actions were filed in this Court. On July 10, 1989, suit was filed in this Court against Lone Star by CSX Transportation, Inc. (hereinafter "CSX"), and claims of breach of contract, breach of warranties and strict liability were therein asserted. Civil No. H–89–2005. On November 6, 1989, Amtrak filed suit against Lone Star asserting similar claims. Civil No. H–89–3085. On December 6, 1989, Lone Star sued LaFarge claiming breach of contract and breach of warranties. Civil No. H–89–3343.[2]

On February 8, 1990, the Judicial Panel on Multidistrict Litigation entered an Order transferring all related cases to this Court for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. Suits filed in the District of Massachusetts against Lone Star by Metro–North Commuter Railroad Company (hereinafter "Metro–North") and the Massachusetts Bay Transportation Authority (hereinafter the "MBTA") were accordingly transferred to this Court. Civil Nos. H–90–748 and H–90–1741.[3] From time to time status conferences have been held with counsel in all consolidated cases in attendance, and Pretrial Orders Nos. 1, 2, 3 and 4 have heretofore been entered by the Court.

On December 10, 1990, Lone Star and its subsidiary San–Vel filed Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the Southern District of New York. Further proceedings in the multidistrict litigation pending in this Court were thereupon stayed pursuant to the provisions of 11 U.S.C. § 362. Following a hearing held on March 20, 1991, the Bankruptcy Court issued an Order lifting the automatic stay with respect to certain aspects of the litigation pending in this Court and permitting the filing of motions for summary judgment. On June 13, 1991, the Bankruptcy Court modified its earlier Order and permitted suits against Lone Star included in this multidistrict litigation to continue to final judgment.

Thereafter, plaintiffs and defendants filed the motions for partial summary judgment which are now pending before the Court.

(a)

### Concrete Cross Ties

Concrete railroad cross ties, although widely used in Europe and Asia since World War II, are a relatively new product in the United States. Railroads in the United States typically utilize larger freight cars with heavier loads in longer, heavier trains than the rail industry in Europe and elsewhere. Because of these differences, the acceptance of concrete ties by railroads in the United States was slow. It was not until Amtrak purchased some 1.1 million concrete ties from Sante Fe Pomeroy/San–Vel in 1977 that the American railroad industry began to view concrete ties as a viable alternative to traditional wooden ties.

Concrete ties roughly consist of stretched steel tendons around which a certain type of cement is poured. Once the cement has hardened, the steel tendons are released and permitted to contract into the tie, although the tendons may thereafter be visible at the ends of the tie. The concrete tie absorbs stress and force through an interplay between the strength of the steel tendon, the strength of the concrete, and the force they exert against each other.

**2.** Also filed in this Court was an action brought by Peerless Insurance Company against Lone Star seeking monies allegedly due and owing on a performance bond. Civil No. H–90–336. On July 8, 1991, the Court granted Lone Star's motion for summary judgment filed in that case.

**3.** By Order dated October 3, 1991, the Judicial Panel on Multidistrict Litigation transferred to this Court three additional suits filed by MBTA in the District of Massachusetts. These cases have not as yet been docketed in this Court. When the pleadings have been received, these suits will be processed pursuant to the Panel's "tag-along" procedures. *See Manual for Complex Litigation, Second,* § 31.122, p. 255 (1985).

Concrete ties are more expensive than wooden ties. According to a Lone Star memorandum, the price of a concrete tie is approximately $70.00 per tie, while wooden ties cost approximately $40.00 per tie. However, concrete ties are expected to last longer than wooden ties. The service life of wooden ties ranges from 15–30 years while concrete ties are designed to have a service life of some 50 years. Other advantages of concrete ties may be lower maintenance costs, higher speeds and lower fuel consumption of trains and fewer derailments. In addition, wooden ties are normally treated with creosote, a chemical which may be harmful to the environment and, in light of recent stricter environmental legislation, disposal of wooden ties after use is more difficult.

Lone Star entered the concrete railroad tie industry in 1979 when it purchased San-Vel. Shortly thereafter, Lone Star began a marketing and advertising campaign to promote the use of concrete ties throughout the United States. In July, 1981, Lone Star hired David A. Pittinger as its National Sales Manager, Railroad Products. Pittinger was given the responsibility of contacting railroad executives and convincing them of the desirability of using concrete ties. Pursuant to this assignment, Pittinger called upon the chief engineers of a number of prominent railroads, including Amtrak and CSX. In his deposition, Pittinger stated that he had told railroad executives that the concrete ties would have a 50–year service life.

Pittinger reported first to William L. Read, Vice President of Lone Star's Railroad Products Group, and then later to Dennis Kash, who assumed that position in June of 1983. In an interoffice memorandum dated October 12, 1982, Read of Lone Star discussed the Company's marketing strategy. Read stated that, in order for concrete ties to be used widely in the United States, Lone Star would need to convince the railroads that the benefits of concrete ties justified the greater initial costs. The benefits outlined by Read were lower maintenance costs, higher track availabili-

ty, lower fuel consumption, and fewer derailments.

In September of 1982, Lone Star had published a study entitled the "Economic Comparison of Concrete and Wood Railroad Ties." The study stated that concrete ties had a longer tie life and promoted longer rail life and wheel wear. The study also stated that because concrete ties required less maintenance, the railroads would have more track available at any given time. The study concluded that the initial higher cost of concrete ties would be recovered anywhere from 2–10 years depending on the type of track.[4] During their visits to the various railroads, Lone Star representatives provided the railroads with a copy of the "Economic Comparison" study.

In other brochures published in 1983 and 1984, Lone Star advertised its concrete ties as having longer tie life and greater reduced maintenance than wooden ties. One brochure stated:

Concrete ties are designed for a fifty-year life. Structural analysis, laboratory tests, and long-term service prove that fifty years is a realistic assumption ... [h]igh strength, prestressed, air-entrained concrete resists weather, abrasion, chemical reaction, moisture, and freezing and thawing cycles.

In one article published in the November, 1983 issue of "Concrete Construction," Kash stated that "[concrete ties] will function without failing for 40 to 50 years." These other brochures were also given to railroad executives during periodic visits. Like Pittinger, Kash testified at his deposition that he believed a concrete tie would last for fifty years and that he had told his sales force as much.

Representatives of Lone Star attended the 1982 and 1985 Roadmasters conventions in Chicago and Dallas and promoted the use of concrete ties. In 1986, Lone Star produced a promotional video which was shown to prospective customers during sales calls. From time to time, representatives of Lone Star made numerous sales

---

4. Curved track and sharply graded track place more wear and tear on ties than straight track.

calls on railroad chief engineers throughout the country.

(b)

*Transactions with Amtrak and MBTA*

Amtrak operates a railroad system running from Washington, D.C. to Boston, Massachusetts, known as the Northeast Corridor. The Northeast Corridor is the most heavily travelled rail segment in the country and is used for both high-speed passenger traffic and lower-speed commuter and freight traffic. A fifteen-mile stretch of the Northeast Corridor located near Boston is owned by the MBTA. These fifteen miles of track are known as the MBTA's Southwest Corridor. Pursuant to an agreement between MBTA and Amtrak, Amtrak maintains the track and railbed of the Southwest Corridor, although MBTA owns the track, railbed, and appurtenant structures.

In the early 1970's, the Federal Railroad Administration (FRA) contracted with the private engineering firm of De Leuw, Cather/Parsons (hereinafter "DCP") to assess the benefits of replacing existing wooden ties on the Amtrak lines with concrete ties. DCP issued a number of reports, the last of which recommended that concrete ties be installed on the high speed designated passenger tracks of the Northeast Corridor. This decision was based on the conclusion of DCP that, although the initial cost of concrete ties would be greater, concrete ties would have a longer service life than wooden ties and would require less maintenance.

On August 9, 1977, Amtrak issued a Solicitation for Technical Proposals for the procurement of 1.1 million concrete ties. Attached to the Solicitation was the first draft of a lengthy document entitled "Concrete Tie and Fastening Assembly Technical Provisions" (hereinafter the "Technical Provisions") which contained the specific requirements for the design of concrete ties. The Technical Provisions specified, among other things, the type of cement to be used, the amount of air to be entrained, the type of pre-stressing material to be used, and the size, shape, and weight of the ties. The Technical Provisions also de-

scribed a series of quality control tests to be conducted during the manufacture of the ties prior to acceptance.

From August to November, 1977, the Technical Provisions underwent four revisions, and, on December 13, 1977, Amtrak awarded a contract for the purchase of ties to Santa Fe/San–Vel, a joint venture between Santa Fe–Pomeroy, Inc. and San–Vel Concrete Corporation. The specifications contained in the final form of the Technical Provisions became the standard specifications for all concrete ties at issue in this litigation, although some minor changes were made to accommodate the track dimensions of certain customers. The initial ties purchased by Amtrak were manufactured at San–Vel's facility in Littleton, Massachusetts and, to date, have performed satisfactorily. Shortly thereafter, Lone Star acquired San–Vel, became the owner of the facility in Littleton, Massachusetts and began a campaign to promote the sales of concrete railroad ties.

In 1983, Congress approved funding for the installation of additional concrete ties on some 190 miles of the Northeast Corridor, including the MBTA's Southwest Corridor. On June 6, 1983, Amtrak, the MBTA and the FRA entered into the "Southwest Corridor Ties and Rail Purchase and Sale Agreement" (hereinafter the "Tie Purchase Agreement"). Amtrak agreed to furnish concrete ties to the MBTA for installation on the Southwest Corridor. Pursuant to a Congressional mandate that Amtrak service be improved, the FRA agreed to defray the majority of MBTA's costs, although some payment by the MBTA was contemplated. The Tie Purchase Agreement also provided:

> The title and risk of loss of materials delivered under this Agreement will pass to MBTA upon delivery and acceptance by MBTA. Amtrak will assign to MBTA any applicable warranties on materials delivered and accepted.

On May 23, 1983, Lone Star and three other firms submitted offers in response to a "Request for Quotations" (hereinafter the "RFQ") issued by Amtrak. The RFQ contained a set of specifications drawn in

large part from Amtrak's 1977 Technical Provisions. One difference was the addition of a requirement that the concrete be air entrained between two and five percent.[5] Between May 23, 1983 and July 13, 1983, Amtrak entered into negotiations with Lone Star and with another firm, both of which submitted acceptable bids. On August 5, 1983, Amtrak accepted Lone Star's best and final offer for the purchase of a large number of concrete railroad ties.

Amtrak issued five purchase orders for a total of 355,500 ties under this 1983 contract. The ties were manufactured at San-Vel's facility in Littleton, Massachusetts and were shipped to Amtrak between February of 1984 and March of 1989. Approximately 36,000 ties were delivered to the MBTA and were manually installed on the MBTA's Southwest Corridor.[6] The ties were installed by Amtrak on the Northeast Corridor using a mechanical Track Laying System (hereinafter the "TLS") which Amtrak had previously used to install the ties purchased in 1977. Amtrak contends that it followed the same maintenance and inspection procedures for the 1983 ties as it had for the 1977 ties. Virtually all of those ties were made with cement purchased by Lone Star from LaFarge although, as LaFarge notes, some ties which were made with cement manufactured by Lone Star itself have also begun to deteriorate.

During manufacture in Massachusetts of the concrete ties purchased pursuant to the 1983 contract, agents and employees of Amtrak continuously inspected the ties. Amtrak hired the independent consulting firm of Briggs Engineering (hereinafter "Briggs") to perform a large part of these inspections. The contract between Amtrak and Briggs specified that Briggs would conduct a series of tests on the cement in order to determine that it complied with applicable specifications. Amtrak civil engineers also inspected each so-called "line" of ties (consisting of approximately 550 ties) and confirmed their approval of each line by signing an acceptance report.

In June of 1988, Amtrak discovered premature cracking of the ties during routine track maintenance. Continued inspections disclosed that the cracking of the ties had resulted in a loss of prestress in some ties as evidenced by pull-in of the prestressed steel. In addition, a number of ties which had not been installed on the tracks but had remained in storage also showed signs of cracking and deterioration.

In August of 1988, Amtrak informed Victor Burton, Lone Star's Vice President for Production, of the cracking. On October 25, 1988, Burton and Richard Fredette, Lone Star's Quality Control Manager, physically inspected cracked ties installed in Edison, New Jersey and collected samples for testing. At that time, representatives of Lone Star also inspected deteriorating ties that had been installed by the MBTA on its Needham line. Sixteen of those ties were removed at Lone Star's request for testing.

Between October of 1988 and August of 1989, Lone Star and Amtrak engaged in a series of discussions concerning the causes of the ties' deterioration and the possibility that the reduced strength of the ties would affect the safety of operations on the tracks. During this time, Lone Star was also informed by CSX that ties sold to CSX in 1984 had begun to crack and deteriorate.

In March of 1989, Lone Star informed its other customers that ties sold by it to Amtrak had experienced premature deterioration. On May 12, 1989, Burton wrote to Lone Star's customers stating in pertinent part as follows:

> ... Lone Star is directing this letter to you as the direct contact between Lone Star and your railroad concerning concrete cross ties. It is important that this letter be forwarded to the appropriate railroad official responsible for track maintenance and safety. We would ap-

---

5. Air entrainment involves the placing of air pockets in the cement which, in theory, allows water to expand upon freezing without damaging the tie.

6. The MBTA also purchased an additional 29,-850 ties from Lone Star for use on its Needham and Franklin commuter lines. The ties were installed by various contractors who have been sued by MBTA in the "tag-along" actions being transferred to this Court.

preciate your cooperation in achieving this promptly.

\* \* \* \* \* \*

... Ties which formerly appeared to be satisfactory have deteriorated over a relatively short period of time to a point where the railroad in question is replacing them. At its worst, this deterioration results in loss of prestress in the ties which could adversely affect the load carrying capabilities. It is possible that routine track inspection would not reveal this loss of prestress force. During inspection, particular attention should be given to the ends of the ties where pull-in of strand could indicate such loss.

On August 15, 1989, Stephen C. Rogers, Amtrak's General Counsel, wrote to John Martin, Vice President of Lone Star, stating that Amtrak believed the ties to be in breach of the 1983 contract and the warranties made thereunder. On October 18, 1989, Rogers again wrote to Martin communicating Amtrak's formal rejection and revocation of acceptance of all ties purchased under the 1983 contract.

Beginning in May of 1989, Amtrak had replaced a number of concrete ties on a "spot" replacement basis. According to Amtrak, it has determined that spot replacement is inefficient because such a large number of ties are deteriorating that the continuous inspection and grading process consumes more resources than would overall replacement of the ties. Based on this determination, Amtrak has now begun to replace each and every tie.

(c)

*The Amtrak Specifications*

The contract entered into between Amtrak and Lone Star consisted of the RFQ, the Technical Provisions and a lengthy document entitled "General Provisions." Paragraph 1.4.1. of the Technical Provisions stated that the concrete ties will be used in the Northeast Corridor and "shall be suitable for service exposed in that environment." Paragraph 2.1 of the Technical Provisions addresses the performance of the concrete ties, as follows:

The intent of this specification is to obtain uniform quality, durability, and performance throughout the design service life of 50 years for concrete ties and shoulder inserts and 15 years for other components with minimum maintenance.

Paragraph 2.2 of the Technical Provisions contains a number of detailed requirements for the concrete to be used. The Technical Provisions also state that, at the time of manufacture, daily inspections would be conducted and that visible cracking of individual ties would be cause for rejection of the entire lot of ties produced.

The General Provisions discuss a range of inspection procedures, the allocation of risk of loss, and warranties. Clause 5 of the General Provisions states that all supplies shall be subject to inspection and test by Amtrak at all times during manufacture and prior to acceptance. Subparagraphs (b) and (d) read in pertinent part as follows:

(b) In case any supplies or lots of supplies are defective in material or workmanship or otherwise not in conformity with the requirements of this contract, AMTRAK shall have the right either to reject them (with or without instructions as to their disposition) or to require their correction.

\* \* \* \* \* \*

(d) The inspection and test by AMTRAK of any supplies or lots thereof does not relieve the Contractor from any responsibility regarding defects or other failures to meet the contract requirements which may be discovered prior to acceptance. Except as otherwise provided in this contract, acceptance shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud.

Clause 15 of the General Provisions addresses the question of risk of loss. This Clause states generally that the risk of loss passes to Amtrak at the F.O.B. point of delivery, but that passage of title to Amtrak shall not in any way relieve Lone Star of its obligations under the contract, nor shall it be treated as a waiver of Amtrak's right to later reject any supplies which failed to meet any warranty expressed or implied.

Clause 27 of the General Provisions is entitled "Warranty of Supplies." The Clause reads in pertinent part as follows:

(a) Notwithstanding inspection and acceptance by AMTRAK of supplies furnished under this contract or any provision of this contract concerning the conclusiveness thereof, the contractor warrants that at the time of delivery;

(i) all supplies furnished under this contract will be free from defects in material or workmanship and will conform with the specifications and all other requirements of this contract. . . .

(b) The Contracting Officer shall give written notice to the Contractor of any breach of the warranties in paragraph (a) of this clause within one year after delivery of the nonconforming supplies.

Subparagraph (i) of Clause 27 expressly disclaims implied warranties of merchantability and fitness for a particular purpose. Subparagraph (j) states that the rights and remedies provided in Clause 27 are in addition to and do not limit any rights afforded to Amtrak by any other clause of the contract.

### (d)
### *Transactions with Metro–North*

Metro–North is a New York Public Benefit Corporation which owns and operates a commuter railroad system providing daily passenger service to New York City for approximately 95,000 commuters living in upstate New York and Connecticut. Portions of Metro–North's track system also carry light freight traffic.

Metro–North and Lone Star first entered into negotiations for the purchase of concrete ties in March of 1984. At that time, Metro–North stated that it was interested in purchasing ties for a three mile stretch of electrified track located in a deep cut between two 20–foot stone retaining walls, an area in which the drainage conditions were very poor. This poor location of the track made tie replacement, inspection, and maintenance costs very high, and Metro–North sought to reduce these costs by purchasing concrete ties. Although Metro–North asserts that wooden ties last up to

thirty years, there is evidence in the record that, with respect to this stretch of track, wooden ties were replaced approximately every six years.

On March 29, 1984, Metro–North's Assistant Track Engineer, David L. Ordas, met with three Lone Star representatives, Kash, Burton and Phillip J. McQueen, Lone Star's technical consultant. At that meeting, Lone Star recommended what it termed "the AMTRAK tie" for use by Metro–North with some adaptations. Following the meeting, Lone Star sent to Metro–North a copy of the Amtrak Technical Provisions and a number of drawings of both the concrete tie and the concrete tie assembly. Lone Star also offered the services of their technical consultant, McQueen, to help revise the specifications to meet Metro–North's needs.

In the next several months, Metro–North reviewed the information provided by Lone Star and inspected concrete ties in service on the Northeast Corridor. In December of 1984, Lone Star sent to Metro–North a series of revisions to be made to the specifications, and those revisions were adopted by Metro–North. There was a need to design a third-rail support plate to be affixed to the tie, and Metro–North engineers apparently revised the original design of the bracket plate. Metro–North did require that Lone Star submit to Metro–North for examination a complete design analysis of the proposed tie and associated hardware which included information regarding the physical and chemical compositions of the concrete batch.

On February 27, 1985, Metro–North issued a formal RFQ for the purchase of 7,428 concrete ties and 1,857 concrete rail support plates. The RFQ was accompanied by specifications developed during discussions with Lone Star. Lone Star was the only bidder. Its bid was submitted on March 19, 1985 and incorporated a separate "design drawing" submitted by McQueen, the technical consultant. The final tie design was named the "Lone Star Type TA–2" tie and was later offered for sale to other transit companies.

Metro–North accepted Lone Star's bid and, on April 24, 1985, issued the first purchase order for 7,428 concrete ties at a unit price of $62.20 per tie. The purchase order contained a set of terms and conditions which stated, *inter alia,* that all warranties, express and implied, applied to any articles furnished and would not be excluded or modified. In August of 1986, Metro–North made a second purchase of 1,000 additional ties at a unit price of $65.58 per tie. The ties purchased in 1986 were manufactured pursuant to the Type TA–2 design used to make the earlier ties. The 1986 purchase order contained the same warranty provisions as the 1985 purchase order.

The first set of ties purchased were delivered by Lone Star to Metro–North between August and October of 1985. The majority of those ties were installed on the three-mile track of the Harlem line described hereinabove, and the remainder were stockpiled. Lone Star ties were again laid on the Harlem line in September and October of 1986 after the second set of ties were delivered. Following this installation, 617 ties were stockpiled in Metro–North's Mott Haven railroad yard located in the Bronx, New York. The stockpiled ties were stacked in uncovered tiers and have never been used.

In 1988, Metro–North issued an RFQ for the purchase of an additional 26,500 ties. The RFQ was made on the basis of a slightly revised version of the original technical specifications used in 1985. The revisions did not change the structural or concrete specifications for the ties. Lone Star submitted its bid by letter dated March 31, 1988, in which it offered for sale 26,500 Type TA–2 ties identical to those supplied to Metro–North in 1985 and 1986. Metro–North accepted Lone Star's bid and issued a purchase order on June 1, 1988. An additional 3,000 ties were purchased from Lone Star in July of 1988 under a slightly modified design styled the "Type TA–3" ties. These ties were identical except that the rail seat dimensions were modified to accommodate a 132 RE rail rather than a 119 RE rail.

In August of 1988, prior to the manufacture by Lone Star of any of the ties purchased by Metro–North in June and July of 1988, Lone Star was informed by Amtrak that its concrete ties had begun to deteriorate prematurely. Nevertheless, on November 2, 1988, Lone Star began to manufacture ties pursuant to Metro–North's two 1988 purchase orders.

In March of 1989, Lone Star informed Metro–North that other Lone Star customers had begun to detect premature deterioration in concrete ties similar to those purchased by Metro–North. In April of 1989, Metro–North conducted an inspection of its tracks which confirmed that the ties sold by Lone Star to it had begun to deteriorate prematurely as well. Stockpiled ties at the Mott Haven yard in the Bronx had also begun to deteriorate.

In light of this discovery, Metro–North notified Lone Star that it would not accept delivery of Lone Star ties unless Lone Star (1) demonstrated that the new ties were free of the defect which caused deterioration in the 1985/1986 ties; (2) compensated Metro–North for the deteriorating ties; and (3) provided written assurances of the quality of the new ties. On May 5, 1989, representatives of Lone Star met with Metro–North officials to discuss the deteriorating ties. Lone Star was unable to provide an explanation for the cracking. Lone Star stated at the time that it had produced 14,000 ties for the 1988 purchase orders and could not guarantee their quality.

After Lone Star had written to its customers informing them of the potential safety hazards posed by the deteriorating ties, Lone Star again wrote to Metro–North stating that it would provide a warranty on the new ties to the effect that, should they deteriorate on an accelerated basis, Lone Star would deliver a replacement tie to a Metro–North yard for twenty years after delivery of the ties. This warranty did not include any offer by Lone Star to pay the costs of inspecting the ties or any of the costs of replacement of the ties. Metro–North considered this warranty offer to be inadequate. By letter dated June 29, 1989,

Metro–North cancelled the two 1988 purchase orders.

(e)

*Transactions with CSX*

CSX is a freight railroad which conducts passenger operations for Amtrak in certain areas. CSX conducts its railroad operations in some 20 states in the United States as well as in Ontario, Canada and is engaged mainly in the hauling of freight or coal. CSX is the successor in interest of the Chessie System Railroads.

In early 1984, Pittinger of Lone Star began negotiations with the Chief Engineer of CSX for the sale of concrete cross ties to be installed on a stretch of track located near Deepwater, West Virginia. On May 17, 1984, CSX placed an order with Lone Star for the purchase of 13,500 cross ties. The purchase order provided for the purchase of the Lone Star "M" cross ties, and Pittinger testified at his deposition that this was a standard tie offered by Lone Star. Although the "M" cross tie was in fact the same tie manufactured by Lone Star for Amtrak, the ties were not customized for CSX in any fashion, nor did the purchase order incorporate the Amtrak Technical Provisions as did the Metro–North orders. During installation of these ties, Lone Star's representatives Pittinger and McQueen visited the CSX site and determined that the roadbed and track had been properly and carefully prepared by CSX.

In 1985, CSX purchased an additional 16,300 concrete ties from Lone Star for installation on a stretch of track located in Covington, Virginia. For this purchase, CSX issued a formal Inquiry and had attached to the Inquiry a copy of the Amtrak Technical Provisions. In a letter dated March 7, 1985, Lone Star offered for purchase the "MA–3" concrete tie. It was stated at the time of the offer and is not now disputed that the "MA–3" tie is identical to the "M" tie purchased by CSX in 1984. An order was issued by CSX to Lone Star for the purchase of these "MA–3" ties.

During installation of this second set of CSX ties, James Lawson of Lone Star visited the site in Virginia. Lawson later reported to Kash:

It appears to me that an excellent job of grading was performed in this particular area and this will probably be one of the premier test installations in the United States for concrete ties ...

\* \* \* \* \* \*

In my opinion, the care, time and money that Chessie has thus far performed on this installation, should make it an absolute show place for us to show potential customers of concrete ties.

In March of 1989, CSX representatives met with Lone Star to discuss the fact that ties were deteriorating. At this meeting, CSX requested an immediate shipment of 200 replacement ties for those ties which CSX sought to remove for safety reasons. Lone Star advised that it would send no ties without a purchase order. After CSX objected, Lone Star eventually agreed to send these ties.

Thereafter, CSX commenced "spot" replacement of deteriorated ties. Following receipt of Burton's letter of May 12, 1989 warning of potential loss of prestress and following a period of some five months in which the ties continued to deteriorate, CSX removed all concrete ties in late 1989. CSX asserts that removal of all these ties was necessary to avoid possible deterioration and safety problems during the more severe weather of the winter months.

(f)

*Rate of Deterioration*

In early 1989, CSX and Lone Star developed a common rating system whereby deteriorating ties were divided into five grades as follows:

Grade 1. No visible cracks.

Grade 2. Longitudinal unconnected cracks on the tie ends.

Grade 3. Longitudinal cracks extending from the ends toward the center of the tie and transverse lines beginning to form.

Grade 4. Large cracks on both end and center joined to form map cracking and some bond release.

Grade 5. Total bond release and loss of ability to hold clip shoulder in place.

Ties which fell into either the Grade 4 or the Grade 5 category were considered to have suffered a loss of prestress which could affect their load carrying capabilities.

In moving for partial summary judgment, all of the railroads have referred to this rating system. Amtrak states that, as of July 30, 1990, 6.80% of the ties it purchased were rated Grade 3 or worse. The MBTA states that 4 out of every 5 concrete ties in the Southwest Corridor have deteriorated to Grade 2 or more and that approximately 24% of all such ties have deteriorated to Grade 3 or more and may be unsound.

An evaluation of the deterioration of CSX ties is set forth in a letter to Lone Star dated April 14, 1989, in which CSX furnished Lone Star with the results of inspections made over a one month period. For the approximately one month period, from March of 1989 to April of 1989, the percentage of CSX ties installed in Deep Water, West Virginia and rated Grade 5 increased from 1.3% to 4.8%. The percentage of CSX ties rated Grade 4 increased from 1.2% to 8.1% during that same period. According to Metro–North, 20% of its installed ties had reached Grade 4 or worse at the time of an inspection on March 31, 1991, and approximately 75% of all its ties exhibited some form of visual cracking.

II

*The Claims*

In Civil No. H–89–2005, CSX has sued Lone Star asserting four separate claims. Count I alleges a breach of implied warranty of fitness for the particular purpose, and Count II alleges a breach of implied warranty of merchantability. Count III alleges a breach of express warranties, and Count IV alleges that Lone Star was negligent in the design, manufacture, and testing of the ties.

In its amended complaint filed in Civil No. H–89–3085, Amtrak has asserted six claims against Lone Star, as follows: (1) breach of express warranties within the contract; (2) breach of express warranties based on representations; (3) breach of contract; (4) strict liability; (5) negligence; and (6) negligent misrepresentation.

In Civil No. H–90–748, Metro–North has sued Lone Star asserting six separate claims, as follows: (1) breach of express warranties; (2) breach of implied warranty of merchantability; (3) breach of implied warranty of fitness for the particular purpose; (4) breach of contract; (5) negligence; and (6) negligent misrepresentation.

The complaint filed by the MBTA in Civil No. H–90–1741 alleges five separate claims against Lone Star, as follows: (1) breach of express warranties; (2) breach of contract; (3) negligence; (4) strict liability; and (5) violation of Mass.Gen.Laws ch. 93A § 2 by engaging in unfair and deceptive acts and practices.

III

*Summary Judgment Principles*

As set forth in Rule 56(c), F.R.Civ. P., the standard for the granting of a motion for summary judgment is that the moving party show "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." One of the purposes of Rule 56 is to require a party, in advance of trial and after a motion for summary judgment has been filed and supported, to come forward with some minimal facts to show that it may not be liable under the claims alleged or subject to the defenses asserted. *See* Rule 56(e). A "mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely," *Barwick v. Celotex Corp.*, 736 F.2d 946, 958–59 (4th Cir.1984), quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C.1966), *aff'd*, 388 F.2d 987 (4th Cir.1967). In the absence of such a minimal showing, a party moving for summary judgment should not be required to undergo the expense of preparing for and participating in a trial of the issue challenged. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

However, the burden is on the party moving for summary judgment to show that no genuine issue of fact exists and that the movant is entitled to judgment as a matter of law. *Barwick v. Celotex, supra,* at 958. The facts and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985). The Fourth Circuit has consistently repeated its holding in *Pierce v. Ford Motor Co.,* 190 F.2d 910, 915 (4th Cir.), *cert. denied,* 342 U.S. 887, 72 S.Ct. 178, 96 L.Ed. 666 (1951), that summary judgment is a drastic measure which should not be granted unless it is perfectly clear that there are no genuine issues of material fact in the case. *Ballinger v. North Carolina Agricultural Extension Service,* 815 F.2d 1001, 1004–1005 (4th Cir.), *cert. denied,* 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987); *Kirkpatrick v. Consolidated Underwriters,* 227 F.2d 228 (4th Cir.1955). Summary judgment should not be granted if inquiry into the facts is desirable to clarify the application of the law. *Pierce v. Ford Motor Co., supra* at 915.

The Fourth Circuit has further emphasized that summary judgment is seldom appropriate in cases in which particular states of mind are decisive as elements of a claim or defense. *Ballinger,* 815 F.2d at 1005, citing *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979). Cases which turn on a finding of intent are not ordinarily appropriate for disposition by way of a motion for summary judgment since resolution of such an issue depends on the credibility of the witnesses which can best be determined by the trier of fact after observation of the demeanor of the witnesses during direct and cross-examination. *Morrison v. Nissan, Ltd.,* 601 F.2d 139, 141 (4th Cir.1979).

Applying these principles to the facts of record here, this Court finds and concludes that plaintiffs' motions for partial summary judgment must be denied, and that defendants' motions for partial summary judgment must be granted in part and denied in part. The motion for summary judgment dismissing counterclaim filed by plaintiff Metro North will also be denied.

## IV

### *Lone Star's Motions for Partial Summary Judgment*

#### (a)

#### *Statute of Limitations*

Lone Star contends that it is entitled to summary judgment as to the warranty and contract claims asserted by the plaintiffs because they are time-barred under § 2–725 of the Uniform Commercial Code (hereinafter the "U.C.C."), which has been adopted in Maryland, the District of Columbia and New York and which provides that suit must be brought within four years after a cause of action has accrued.[7] In each jurisdiction, § 2–725 of the U.C.C. provides as follows:

(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty *explicitly* extends to a future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or

7. Lone Star also contends that Amtrak is limited to a one-year warranty. In Clause 27(a) of the General Provisions, Lone Star warranted that, at the time of delivery, the ties would be free of defects. Clause 27(b) provides that Amtrak should notify Lone Star of any breach of warranties contained in Clause 27(a) within one year after delivery. However, Clause 27(j) further provides that the rights of Amtrak under Clause 27 do not limit any other rights under the contract, and Clause 34 states that the rights of Amtrak under the contract are cumulative and in addition to those provided by law. In view of these contractual provisions, this Court concludes that Amtrak's claims in this case are not barred by this one-year provision.

should have been discovered. (Emphasis added)

Md.Com.Law Code § 2–725 (1975); D.C.Code Ann. § 28:2–725 (1963).

Plaintiffs concede that § 2–725 governs the transaction at issue. However, plaintiffs argue that the purchase agreements in this case include a warranty which explicitly applies to a future performance of the goods. As noted, Paragraph 2.1 of the Amtrak specifications stated:

> The intent of this specification is to obtain uniform quality, durability, and performance throughout the design service life of 50 years for concrete ties....

Plaintiffs contend that the provision cited hereinabove created an express warranty which explicitly extended to future performance. Plaintiffs also point to statements made in Lone Star brochures and other materials touting the lower life cycle cost of concrete ties, statements which plaintiffs contend constituted an express warranty of future performance. According to plaintiffs, it makes little sense to construe representations relating to the longer life of the product and specifications relating to quality, durability and performance as warranties applicable to the condition of the product only upon delivery.[8]

An express warranty is defined as any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain. Such statements create an express warranty that the goods shall conform to the affirmation or promise. § 2–313(1). It is not necessary that the seller use formal language such as "warrant" or "guarantee" or that the seller have the specific intention to extend a warranty; however, an affirmation merely of value or a statement of the seller's opinion or commendation does not create a warranty. § 2–313(2).

For a warranty of future performance to exist under § 2–725, the terms of the warranty must unambiguously and explicitly indicate that the manufacturer is warranting the future performance of the goods for a specified period of time. *R.W. Murray Co. v. Shatterproof Glass Corp.*, 697 F.2d 818 (8th Cir.1983). The term "explicit" has been defined as "not implied merely, or conveyed by implication; distinctly stated; plain language; clear; not ambiguous; express; unequivocal." *Binkley Company v. Teledyne Mid–America Corp.*, 333 F.Supp. 1183 (E.D.Mo.1971).

In *Mittasch v. Seal Lock Burial Vault, Inc.*, 42 A.D.2d 573, 344 N.Y.S.2d 101 (1973), twelve years after the purchase of a casket, plaintiff brought suit when it was discovered upon exhumation that the casket had leaked. The seller had provided plaintiff with a certificate of assurance which stated that the casket would be "free from material defects or faulty workmanship and will give satisfactory service at all times." 344 N.Y.S.2d at 103. The Court held that the seller's statement constituted an explicit warranty of future performance. *Id.* at 103. It has also been held that when a vendor warrants the quality of goods, such warranty is breached when tender of delivery is made, but where a vendor warrants the performance of goods, that warranty necessarily contemplates a reasonable period of performance during which the defect or failure would manifest itself. *Iowa Manufacturing Co. v. Joy Manufacturing Co.*, 206 Mont. 26, 669 P.2d 1057, 1060 (1983).

Lone Star argues that the language of the specifications and the statements made in its promotional literature are similar to other representations which have been held not to be a warranty of future performance. For example, in *Jones & Laughlin Steel Corp v. Johns–Manville Sales Corp.*, 626 F.2d 280, 291 (3rd Cir.1980), the seller stated in promotional materials that it

---

**8.** On the record here, there is no merit to the contentions of both CSX and Metro–North that the statute of limitations was equitably tolled because Lone Star did not immediately inform other customers of cracking after receiving notice from Amtrak and because Lone Star promised to investigate and report on the deterioration after informing the railroads of the problem. Nor on this record is Lone Star equitably estopped from asserting a statute of limitations defense.

could "cite many asbestos roofs that, today, are still performing satisfactorily after more than forty (40) years of exposure." The Third Circuit held that this language did not create an explicit warranty of future performance for the roof installed for the buyer. Other courts have held that similar statements are not warranties of future performance. *Tolen v. A.H. Robins, Co.*, 570 F.Supp. 1146 (N.D.Ind.1983) (statement made that some women have been effectively protected by the same IUD for five years or longer); *South Burlington School Dist. v. Calcagni–Frazier–Zajchowski Architects, Inc.*, 138 Vt. 33, 410 A.2d 1359 (1980) (statement made that roof would do as good a job as other material with a built-up roof of twenty years).

As discussed in Part V(b) of this Memorandum and Order, it cannot be determined on the record presently before the Court whether as a matter of law the contracts between the railroads and Lone Star included express warranties of future performance. It will be for the jury to determine whether under each contract a basis for the bargain included an express warranty. Although it is not necessary that the formal terms "warrant" or "guarantee" be used, the authorities cited herein require that under § 2–725 the claimed warranty must explicitly indicate that Lone Star was warranting the future performance of ties for a specific period of time.

On the record here, the Court cannot determine as a matter of law that Lone Star did not explicitly warrant the future performance of its concrete railroad ties. The question whether the warranty explicitly extended to the future is a mixed question of fact and law requiring an ultimate determination by the trier of fact. *Pack & Process, Inc. v. Celotex Corp.*, 503 A.2d 646, 652 (Del.Super.Ct.1985). Here, ambiguity exists as to the seller's intention, and parol evidence is necessary before the issue can be finally determined. If express warranties existed which extended to future performance, plaintiffs' claims would not be barred by the four year limitations period of § 2–725. Accordingly, Lone Star is

not entitled to partial summary judgment as to plaintiffs' claims for breach of contract and for breach of express warranties.

Lone Star is, however, entitled to partial summary judgment as to the claims of breach of implied warranties asserted by Metro–North and CSX. It is well established that an implied warranty cannot extend to future performance of the goods. *Rockstroh v. A.H. Robins Co., Inc.*, 602 F.Supp. 1259, 1268–1269 (D.Md.1985); *Clark v. De Laval Separator Corp.*, 639 F.2d 1320, 1325 (5th Cir.1981); *Stumler v. Ferry–Morse Seed Co.*, 644 F.2d 667, 669 (7th Cir.1981); *Standard Alliance Industries, Inc. v. Black Clawson Co.*, 587 F.2d 813 (6th Cir.1978); *Holdridge v. Heyer–Schulte Corp.*, 440 F.Supp. 1088 (N.D.N.Y.1977). As stated by one Court:

> Section 2–725(2) denies applicability of the discovery doctrine to all *implied* warranty actions. Such unwritten guarant[e]es by definition can never "explicitly" encompass future performance. (Emphasis in original).

*LaPorte v. R.D. Werner Co., Inc.*, 561 F.Supp. 189, 191 (N.D.Ill.1983).

Plaintiff's reliance on *Cucchi v. Rollins*, 574 A.2d 565 (Pa.1990) is misplaced. That case involved the lease of the product at issue rather than as here the sale of the goods allegedly warranted. The nature of a lease requires that the implied warranty extended by the agreement will continue throughout the life of the lease.

As noted hereinabove, there is overwhelming authority that when the sale of goods is involved, implied warranties cannot extend to future performance of the goods. Applying this well-accepted principle to the facts of record here, this Court concludes that defendant Lone Star is entitled, with one exception, to the entry of partial summary judgment in its favor as to all claims asserted against it alleging a breach of implied warranties of merchantability and a breach of implied warranties of fitness for the particular purpose with respect to all ties delivered more than four years before suit was filed by Metro–North and CSX. Because all CSX ties were delivered more than four years prior to the

filing of suit by CSX, its claims for breach of these implied warranties are time-barred *in toto*. Metro–North may pursue in this litigation its claims for breach of implied warranties only with respect to the 1,000 ties purchased in August of 1986. Other such claims of Metro–North are time-barred.

(b)

*The Tort Claims*

■ Contending that a recovery for economic loss alone may not be had in tort, Lone Star also seeks partial summary judgment as to the claims of negligence and strict liability asserted by the railroads.[9] Citing *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), Lone Star argues that under the so-called "economic loss doctrine" the remedies of each railroad lie in an action of contract alone and not in one of tort. This Court would agree.

In *East River*, the Supreme Court, applying admiralty law, held that no products liability claim, whether based on a theory of negligence or on one of strict liability, can be asserted by a plaintiff when the injury claimed is economic loss alone. 476 U.S. at 876, 106 S.Ct. at 2304. In so holding, the Court rejected lower court decisions which had held that an action may be brought in tort for economic loss alone when the tortious act created an unreasonable risk of harm or a dangerous condition or arose from a sudden calamitous event. *See e.g. Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165 (3rd Cir.1981). The Court, in indicating in *East River* that resolution of the degree of risk in such a case is too indeterminate to enable manufacturers to structure their business behavior, said the following:

> [S]ince by definition no person or other property is damaged, the resulting loss is purely economic. Even when the harm to the product itself occurs through an abrupt, accident-like event, the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure

of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law.

476 U.S. at 870, 106 S.Ct. at 2301–02 (citations omitted). The Court noted, however, that recovery may be had for economic loss if a defective product damages property other than the product itself. *Id.* at 867, 106 S.Ct. at 2300.

The parties here differ as to the state law to be applied to this issue. However, that question need not be decided. The law of each jurisdiction in which Amtrak ties are located would deny recovery. Amtrak ties are laid in Massachusetts, Maryland, Delaware, Pennsylvania and New Jersey. The Supreme Judicial Court of Massachusetts has held that "when economic loss is the only damage claimed, recovery is not allowed in tort-based strict liability or in negligence." *Bay State–Spray & Provincetown Steamship, Inc. v. Caterpillar Tractor Co.*, 404 Mass. 103, 533 N.E.2d 1350, 1353 (1989). In so holding, the Court relied upon the decision in *East River*, noting that the opinion "sets forth strong reasons for recognizing a meaningful distinction between tort recovery for physical injuries and warranty recovery for economic loss." *Id.* 533 N.E.2d at 1354.

Courts in Pennsylvania have also denied recovery in tort where the only damage alleged is to the product itself, whether or not the defect posed a risk of other damage or injury or manifested itself in a sudden event. *REM Coal Company v. Clark Equipment Co.*, 386 Pa.Super. 401, 563 A.2d 128, 132 (Pa.1989). In so holding, the Court adopted the *East River* view that the public safety exception was too indeterminate a standard to be applied. *Id.* 563 A.2d at 132. Similarly, the Supreme Court of Delaware has held that "with privity of contract present, a claim does not arise in negligence." *Council of Unit Owners of Sea Colony East v. Carl M. Freeman Assoc., Inc.*, 1990 WL 177632, 1990 Del.Super. LEXIS 412 (1990). In *Council of Unit Owners*, the Court cited with approval the

---

9. Amtrak has argued that Lone Star's motion must be treated as a motion to dismiss since the motion is made solely on the basis of the pleadings. This contention is without merit. *See* Rule 12(c), F.R.Civ.P. Matters outside the pleadings have been presented and considered.

ruling in *East River* that a tort claim should not be allowed to proceed according to the indeterminate "degree of risk" standard. (Slip. op. at 6). Although New Jersey courts have not commented on the *East River* opinion, it has been held in New Jersey that "a commercial buyer seeking damages for economic loss resulting from the purchase of defective goods may recover ... for breach of warranty under the U.C.C., but not in strict liability or negligence." *Spring Motors Distributors, Inc. v. Ford Motor Co.*, 98 N.J. 555, 489 A.2d 660, 663 (1985). Nor is recovery in strict liability available under the substantive law of Maryland. In *Council of Co-Owners Atlantis Condominium, Inc. v. Whiting-Turner Contracting Co.*, 308 Md. 18, 35, 517 A.2d 336 (1986), the Maryland Court of Appeals, although holding that a tort duty may be imposed for mere economic loss where a risk of death or personal injury exists, stated that conditions that present merely a risk to general health, welfare, or comfort but fall short of presenting a clear danger of death or personal injury will not suffice. *Id.* at 35, n. 5, 517 A.2d 336.

In opposing the entry of summary judgment in favor of Lone Star as to its tort claims, Amtrak has not presented evidence indicating that the deteriorating ties at issue presently constitute a clear danger of death or personal injury. By Amtrak's own rating system, only 6.8% of the ties were in July of 1990 rated Grade 3 or worse and may have lost some of their load carrying capacity. Amtrak replaced ties on a "spot" replacement system for more than a year before contemplating a removal of all ties. The process of replacing the ties began in the summer of 1990, almost two years after the cracking was first detected, and will not end until late 1991 or early 1992. Although ties are deteriorating and must be replaced, this Court finds as a matter of law on this record that they have not to date created a risk of death or personal injury. Accordingly, this Court

has concluded from its review of the pertinent authorities, that none of the jurisdictions in which Amtrak concrete cross ties have been laid would permit Amtrak to pursue its claims based on negligence or strict liability.

Similarly, the tort claims of the MBTA and CSX are also barred by the applicable law. As noted, Massachusetts law denies recovery in tort for economic loss. Likewise, the Supreme Court of Virginia, in answering questions certified to it by the United States Court of Appeals for the Fourth Circuit said the following:

> Tort law is not designed, however, to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement. That type of compensation necessitates an analysis of the damages which were within the contemplation of the parties when framing their agreement. It remains the particular province of the law of contracts.

*Sensenbrenner v. Rust, Orling & Neale*, 236 Va. 419, 374 S.E.2d 55, 58 (1988).

The Supreme Court of Appeals of West Virginia has held that recovery for economic loss may be had in tort only when the damage is attributable to a sudden calamitous event. *Anderson v. Chrysler Corp.*, 403 S.E.2d 189 (W.Va.1991), citing *Star Furniture Co. v. Pulaski Furniture Co.*, 171 W.Va. 79, 297 S.E.2d 854 (1982). The West Virginia Court held that "in order to recover under *Star Furniture*, the damage to the product must result from a sudden calamitous event attributable to the dangerous defect or design of the product itself." 403 S.E.2d at 191, citing *Capitol Fuels, Inc. v. Clark Equipment Co.*, 382 S.E.2d 311 (W.Va.1989). Thus, under the law of Virginia, West Virginia, Maryland, Delaware, Pennsylvania, New Jersey, and Massachusetts, the tort claims asserted in this case by Amtrak, CSX, and the MBTA are barred.

In addition, Metro-North's tort claims are barred under New York law.[10] In

---

10. Metro-North also claims that it has a viable cause of action for the negligent performance of contract services relating to the services of Lone Star's technical expert in drawing up the specifi-

cations for the ties. Under the circumstances of this case and on the record here, this Court concludes as a matter of law that there is no merit to this claim of Metro-North. *See Niaga-*

*Schiavone Construction Co. v. Elgood Mayo Corp.*, 81 A.D.2d 221, 232, 439 N.Y.S.2d 933, 939 (1st Dep't.1981) (Silverman, J., dissenting), *dissent adopted on appeal*, 56 N.Y.2d 667, 451 N.Y.S.2d 720, 436 N.E.2d 1322 (1982), Judge Silverman stated:

> the rationale behind strict liability in personal injury situations is not well-suited to claims alleging only economic loss. Economic loss results from the failure of the product to perform to the level expected by the buyer and the seller.

This reasoning was expressly adopted by the New York Court of Appeals, which reversed the majority opinion in *Schiavone* and adopted the dissent of Judge Silverman. 451 N.Y.S.2d at 720–21, 436 N.E.2d at 1323. *See also County of Suffolk v. Long Island Lighting Co.*, 728 F.2d 52, 62 (2nd Cir.1984); *Long Island Lighting Co. (LILCO) v. Transamerica Delaval*, 646 F.Supp. 1442, 1457 (S.D.N.Y.1986).

In sum, it is apparent from the record in this case that the danger of failure of the railroad ties to the extent that such failure would cause a derailment or other calamitous event is merely speculative at best and is not the type of circumstance which would support the assertion of a tort claim by any of the railroads. The claims of all the railroads in this case arise under the contracts between the parties and are based on the failure of the product to perform as expected. Any recovery by the railroads in these actions will therefore be in contract, not in tort.

For all these reasons, defendant Lone Star is entitled to partial summary judgment as to the claims of all plaintiffs based on theories of negligence or strict liability.

## V

### *The Motions of the Railroads*

Amtrak has moved for partial summary judgment seeking a ruling as a matter of law that it properly revoked acceptance of the ties pursuant to the contract and the applicable provisions of the U.C.C. In addition, Amtrak, the MBTA, and Metro–North have all moved for partial summary judgment on their claims of breach of express warranties.[11] Metro–North and CSX have also moved for partial summary judgment on their claims of breach of implied warranties of merchantability and implied warranties of fitness for the particular purpose.

Initially, it should be noted that the parties do not dispute that the concrete ties have failed to perform as intended. The service life of the ties has been substantially reduced, they are not of uniform quality, and they require higher rather than lower maintenance. However, whether performance of the ties was expressly or impliedly warranted and the cause of the ties' defects are matters of sharp dispute in this litigation.

### (a)

### *Revocation of Acceptance*

Amtrak claims that it is entitled to partial summary judgment irrespective of any warranty considerations because Amtrak properly revoked acceptance of the ties under the provisions of the 1983 contract and the U.C.C.[12] Relying on Clause 5(d) of the General Provisions which provides that acceptance of the ties shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud, Amtrak contends that the ties contain "latent defects" and that revocation of

---

*ra Mohawk Power Corp. v. Stone & Webster Engineering Corp.*, 725 F.Supp. 656, 660 (N.D.N.Y.1989).

**11.** Lone Star contends that the MBTA has no standing to bring suit because the agreement entered into between Amtrak and the MBTA contemplated only a future assignment of rights which is not effective. This argument is without merit. The agreement stated that "Amtrak will assign to MBTA any applicable warranties on materials delivered and accepted." The ma-

terials were delivered and accepted, and the assignment of rights thereafter became effective. Lone Star also notes that both Amtrak and the MBTA seek judgment for the same ties sold to the MBTA. At the trial, no double recovery will be permitted.

**12.** Since MBTA's ties were a part of Amtrak's 1983 purchase order, Amtrak's revocation would cover the Southwest Corridor ties as well.

**224**

acceptance was properly accomplished by it pursuant to the terms of the contract.

Lone Star contends that Amtrak has not established as a matter of law that the ties were "latently" defective and that the defect could not have been discovered upon inspection. This Court would agree. The determination of latency is essentially a factual one. *United States v. Lembke Construction Co.*, 786 F.2d 1386, 1397 (9th Cir.1986). A latent defect is "one which cannot be discovered by observation or inspection made with ordinary care." *Lembke*, 786 F.2d at 1387. A party seeking to establish a latent defect must shoulder the burden of "establishing the fundamental facts of liability, causation and resultant injury." *Roberts v. United States*, 174 Ct.Cl. 940, 357 F.2d 938, 949 (1966). To recover under a clause such as the one at issue here, the buyer must prove that the defect is latent and incapable of discovery upon reasonable inspection. *Scotco, Inc. v. Dormeyer Industries*, 402 F.2d 336 (7th Cir.1968).

In this case, the manufacture of the ties was subject to extensive inspections undertaken by Amtrak personnel and also by Briggs employees who were hired specifically to perform certain inspections and tests. In moving for partial summary judgment, Amtrak has not established as a matter of law that the defect was latent and could not have been discovered by a reasonable inspection. To demonstrate latency and its inability to have discovered the defect, Amtrak has done little more than rely on the length of time that elapsed between delivery of the ties and the discovery of the cracking and deterioration. In the absence of evidence establishing the nature of the defect, the Court cannot conclude as a matter of law that the defect is latent and could not have been discovered by a reasonable inspection. Although the defect did not manifest itself for several years, it may, depending on its nature, have been discoverable upon inspection at the time of manufacture. Disputed issues of material fact exist, and Amtrak is there-

fore not entitled to partial summary judgment on this ground.[13]

Amtrak also contends that it was entitled to revoke acceptance of the ties under § 2–608 of the Maryland Commercial Code. This contention will likewise be rejected. Section 2–608 provides as follows:

(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it ...

\*   \*   \*   \*   \*   \*

(b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

To revoke acceptance under Maryland law, a buyer must prove that the goods did not conform to the contract. *Champion Ford Sales, Inc. v. Levine*, 49 Md.App. 547, 552, 433 A.2d 1218 (1981). Nonconformity "does not subject the seller to performing the contract to the 'satisfaction' of the buyer, but only to performing in accordance with the terms of the parties' agreement." *H.B. Fuller Co. v. Kinetic Systems, Inc.*, 932 F.2d 681, 687 (7th Cir. 1991). In *H.B. Fuller*, the Court determined that the plaintiff had failed to establish nonconformity because it could not state a reason why the product did not work. 932 F.2d at 687.

As discussed hereinafter, a dispute of material fact exists concerning whether the defect was caused by the failure of the product to conform to a particular provision of the specifications. In *H.B. Fuller*, it was clear that the machine worked but that another machine was needed to make it work efficiently. In this case, although the ties clearly do not work as intended, it has not been established as a matter of law that Lone Star failed to manufacture the ties in conformity with specifications prepared by Amtrak. Accordingly, the Court cannot conclude as a matter of law on this record that Amtrak rightfully revoked ac-

---

**13.** Lone Star also contends that, since Amtrak did not separately plead its right to revoke under the contract, it may not assert that claim

here. This contention is meritless. Amtrak alleged in the complaint that it had revoked acceptance of the ties.

ceptance under § 2–608 of the Maryland Commercial Code.

### (b)
### *Breach of Express Warranties*

■ Amtrak, the MBTA and Metro-North all seek partial summary judgment on the ground that Lone Star breached express warranties contained both in the specifications and in promotional literature and marketing presentations. As noted hereinabove, express warranties are created by any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain, and formal words such as "warrant" or "guarantee" are not necessary to create an express warranty. § 2–313.

Plaintiffs contend that two separate express warranties arose pursuant to § 2–313, first under the provision of the Technical Provisions stating that the concrete ties would be suitable for service, and second under the provision stating that the intent of the specifications was to obtain uniform quality, durability and performance throughout the designed service life of 50 years with minimum maintenance. According to plaintiffs, Lone Star's acceptance of the Technical Provisions as a part of the contracts with the railroads resulted in the creation of express warranties.

In cases in which the seller has adopted the buyer's specifications and those specifications have been incorporated into the contract and form a part of the basis of the bargain, the seller may not deny that a warranty arose merely because the buyer originated the specifications. *Northern States Power Co. v. ITT Meyer Industries, Inc.,* 777 F.2d 405, 412 (8th Cir.1985). Technical specifications, blueprints and the like can be made by the parties to be a part of the basis of the bargain, and, if so, the goods must conform to the specifications. *S–C Industries, Inc. v. American Hydro-*

*ponics System, Inc.,* 468 F.2d 852, 854, n. 3 (5th Cir.1972), citing Comment 5 to § 2–318. However, whether or not an express warranty arises from the language and circumstances of a transaction is a question properly submitted to the jury. *Northern States Power,* 777 F.2d at 411.

On the record here, this Court cannot determine as a matter of law that the contracts between the parties included express warranties arising under provisions of the specifications. This Court has previously indicated that the question whether an express warranty exists under the provisions of a contract should ordinarily be left for determination by the jury. *Copiers Type-writers Calculators v. Toshiba Corp.,* 576 F.Supp. 312, 327 (D.Md.1983). The parties here disagree concerning the inferences which may reasonably be drawn from written provisions of the agreements and from the surrounding facts. *See Morrison v. Nissan, supra* at 141. A strong argument can be made that Paragraph 2.1 of the Technical Provisions constituted an express warranty, rather than a design objective. Nevertheless, there are inferences to the contrary, and a fair-minded jury could on this record reasonably find that no express warranty was intended. *See Anderson v. Liberty Lobby, supra* at 252, 106 S.Ct. at 2512. The issue is one which the jury must decide.

Plaintiffs also contend that express warranties were created by the promotional materials and were breached.[14] The promotional materials contain statements by representatives of Lone Star relating to the longer service life of concrete ties and their lower maintenance costs. Lone Star's internal memoranda reveal that the railroads were initially reluctant to purchase more expensive concrete ties rather than wooden ties and that, in order to sell their product, Lone Star issued promotional materials touting the advantages of concrete ties.

14. Lone Star contends that Clause 26 of the General Provisions precludes evidence of promotional materials under the parol evidence rule. This contention is without merit because Clause 26 does not state that the written contract represents the complete and exclusive statement of the agreement. *See* § 2–202(b) of

the U.C.C. It will be for the jury to determine, from all the evidence presented, what were the terms of the agreement reached between Lone Star and each of the plaintiffs and whether the written provisions constituted an integrated agreement.

Lone Star's promotional efforts were successful, and the ties were purchased pursuant to contracts which may or may not have contained express warranties concerning the service life of the ties.

Where the parties to a contract reduce their agreement to a writing which specifies technical requirements for the goods sold, it cannot be determined without a full development of all the facts whether the buyer relied on verbal assurances and writings intended for general audiences rather than on the specifications themselves. *Price Brothers Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 423 (6th Cir.), *cert. denied*, 454 U.S. 1099, 102 S.Ct. 674, 70 L.Ed.2d 641 (1981). When the promotional materials are considered along with other evidence of record here, this Court cannot conclude as a matter of law that these materials constituted an express warranty. Disputed questions of material fact arise in this case concerning whether express warranties were contained in the written design requirements and technical specifications, whether the writings themselves constitute a complete integration of the agreement between the parties, whether express warranties were contained in promotional materials and whether the promotional materials as well as the technical specifications formed a part of the basis of the bargain.

In contending that the representations and statements contained in the promotional materials constituted an express warranty by Lone Star, plaintiffs rely on *Community Television Services, Inc. v. Dresser Industries, Inc.*, 586 F.2d 637, 641 n. 8 (8th Cir.1978), *cert. denied*, 441 U.S. 932, 99 S.Ct. 2052, 60 L.Ed.2d 660 (1979). However, in that case it was the jury which found that the promotional materials supplemented the specifications and that an express warranty of durability and performance of the product thereby resulted. Similarly in this case, it will be for the jury to determine whether statements in the promotional materials formed a part of the basis of the bargain. Accordingly, plaintiffs are not entitled to partial summary judgment as to their claims that Lone Star breached express warranties.

An issue of causation is likewise presented in this case. Plaintiffs contend that causation is immaterial because a buyer is entitled to recover for breach of an express warranty when the manufacturer warrants that a product will perform in a certain manner and the product fails to perform in that manner. *Community Television Services, Inc. v. Dresser Industries, Inc., supra.* Lone Star in turn argues that the cause of the defect is highly material because Lone Star manufactured the ties pursuant to the specifications provided. Relying on the fact that Amtrak prepared the specifications, Lone Star asserts that if a contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. *Hol-Gar Manufacturing Corp. v. United States*, 175 Ct.Cl. 518, 360 F.2d 634, 638 (1966).

Evidence of record indicates that Amtrak developed the specifications without any input from Lone Star. The specifications developed by Amtrak were incorporated, either in whole or in part, in the agreements between Lone Star and the other railroads. The Amtrak specifications contained highly detailed requirements for the type of the cement to be used, for the level of air entrainment, for the type of aggregate, and for the design of the tie itself. Lone Star contends that evidence exists in this case indicating that the cracking and deterioration may have been caused by the requirements of the specifications. In opposing the entry of summary judgment on the issue, Lone Star has submitted affidavits of experts who have stated that requirements for the manufacture of the cement contained in the specifications may indeed have caused the cracking and deterioration. Summary judgment is not appropriate when the record contains conflicting expert opinions concerning the meaning of technical provisions. *Technitrol, Inc. v. Control Data Corp.*, 550 F.2d 992, 998 (4th Cir.1977).

Amtrak asks the Court to disregard these affidavits because of statements of

counsel for Lone Star early in the litigation that the cracking was caused by sulphur contamination of the cement. This the Court will not do. Before extensive discovery in the litigation was undertaken, counsel for Lone Star did state their belief that deficiencies in the LaFarge cement caused the deterioration. However, these preliminary statements hardly constitute conclusive evidence of causation and they are not on this record binding on Lone Star. Indeed, evidence exists that ties manufactured with Lone Star cement have begun to deteriorate as well. Disputed inferences of fact arise concerning the cause of the deterioration and the cracking of the ties.

On the record here, it is apparent that none of the parties has established how the defect occurred. Whether the defect resulted from Amtrak's failure to specify sufficient air entrainment, from Lone Star's aggregate, or from LaFarge's cement has not been determined. Until the cause of the cracking and deterioration is known, the Court cannot conclude as a matter of law that the Amtrak specifications were not faulty and that the defect did not arise because of requirements of the specifications. *See Fischbach & Moore Int'l Corp. v. Crane Barge R–14*, 476 F.Supp. 282 (D.Md.1979), *aff'd*, 632 F.2d 1123 (4th Cir.1980) (buyer must show that goods did not conform to provisions of the contract and must identify breach).

### (c)
### *Breach of Implied Warranties*

Metro–North and CSX have moved for summary judgment as to their claims that Lone Star breached implied warranties of merchantability and implied warranties of fitness for the particular purpose. As discussed hereinabove, all of the CSX implied warranty claims and most of the Metro–North implied warranty claims are barred by the applicable four-year statute of limitations contained in § 2–725. This Court concludes that the remainder of the implied warranty claims of Metro–North cannot be decided by way of a motion for summary judgment.

There are disputed issues of material fact concerning the extent to which Metro–North relied on Lone Star's expertise and the extent to which Metro–North carefully reviewed and verified the Amtrak specifications which were attached to the RFQ. In addition, the parties dispute whether the ties were purchased for a particular purpose or for their ordinary purpose of serving as railroad ties. Accordingly, the entry of partial summary judgment is not appropriate as to these claims.

For similar reasons, partial summary judgment in favor of Metro–North cannot be entered with respect to Metro–North's claim that Lone Star breached implied warranties of merchantability. Genuine issues of material fact exist concerning the extent to which plaintiff Metro–North required compliance with the specifications, concerning the extent to which the specifications were altered, and concerning the degree to which Metro–North relied on Lone Star's expertise. Under these circumstances, the entry of partial summary judgment in favor of Metro–North on its remaining implied warranty claim is not appropriate.

### VI

### *Metro–North's Motion for Summary Judgment Dismissing Counterclaim*

In Civil No. H–90–748, defendant Lone Star has filed a counterclaim against plaintiff Metro–North alleging that Metro–North breached its contract for the purchase of 14,000 concrete ties manufactured pursuant to the two 1988 Metro–North orders. Prior to the delivery of the ties, Metro–North learned of the deterioration of both its ties and the ties of other railroads. Pursuant to § 2–609 of the U.C.C., Metro–North sought from Lone Star adequate assurances that the product would not fail. When it determined that Lone Star's assurances were inadequate, Metro–North rejected the ties and refused to take delivery. Lone Star contends that Metro–North thereby breached the contract between the parties.

Section 2–609 states as follows:

(1) A contract for sale imposes an obligation on each party that the other's

expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

\* \* \* \* \* \*

(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

In moving for summary judgment dismissing Lone Star's counterclaim,[15] Metro–North contends that, given the information concerning widespread and rapid deterioration of the ties, it had "reasonable grounds for insecurity," and it further asserts that the assurances provided by Lone Star were "inadequate." Lone Star argues to the contrary that "reasonable grounds for insecurity" regarding its performance under the contract did not exist.

The standard is high for a finding of insecurity as a matter of law. *Phibro Energy v. Empresa De Polimeros De Sines Sarl,* 720 F.Supp. 312, 322 (S.D.N.Y.1989). Between merchants the reasonableness of grounds for insecurity must be determined according to commercial standards. *Phibro,* 720 F.Supp. at 322. Whether a party has reasonable grounds for insecurity is therefore a question of fact. *Id.*

There is little doubt that Metro–North had reasonable grounds to fear that the newly manufactured ties would not perform as expected. Nevertheless, that is not the issue which must be decided under § 2–609. The statutory provision in question is concerned with performance by the seller under the contract. On the record here, there are disputed questions of material fact concerning whether Metro–North had reasonable grounds to believe that

Lone Star had not performed according to the specifications and other provisions of the contract.

The Court would also note that a disputed question of material fact exists as to whether the assurances provided by Lone Star were adequate. Lone Star offered to pay the material replacement costs on a one-for-one basis for any tie that failed during the first 20 years. Whether under the particular circumstances of this case, the assurances given by Lone Star pursuant to § 2–609 were adequate is a question of fact to be determined at trial. *Kaiser–Francis Oil Co. v. Producer's Gas Co.,* 870 F.2d 563, 568 (10th Cir.1989). For these reasons, Metro–North's motion for summary judgment dismissing the counterclaim in Civil No. H–90–748 will be denied.

## VII

### *Conclusion*

For all the reasons stated, the motions of the plaintiffs for partial summary judgment will all be denied. Metro–North's motion to dismiss Lone Star's counterclaim will be denied as well. Lone Star's motions for partial summary judgment will be granted in part and denied in part.

Accordingly, it is this 18th day of October, 1991, by the United States District Court for the District of Maryland,

ORDERED:

1. That the motion of the Lone Star defendants for summary judgment as to Counts I, II and IV of the complaint filed by plaintiff CSX in Civil No. H–89–2005 be and the same is hereby granted;

2. That the motion of plaintiff CSX for partial summary judgment filed in Civil No. H–89–2005 be and the same is hereby denied;

3. That the motion of plaintiff Amtrak for summary judgment filed in Civil No. H–89–3085 be and the same is hereby denied;

4. That the motion of the Lone Star defendants for partial summary judg-

---

**15.** Since materials outside the pleadings have been presented and considered, the parties

agree that the motion should be treated as a motion for summary judgment.

ment against plaintiff Amtrak and against plaintiff MBTA filed in Civil Nos. H–89–3085 and H–90–1741 be and the same is hereby denied;

5. That the motion of the Lone Star defendants for summary judgment against plaintiff Metro–North filed in Civil No. H–90–748 be and the same is hereby granted in part and denied in part;

6. That the motion of plaintiff Metro–North for partial summary judgment filed in Civil No. H–90–748 be and the same is hereby denied;

7. That the motion of plaintiff Metro–North for summary judgment dismissing Lone Star's counterclaim in Civil No. H–90–748 be and the same is hereby denied; and

8. That the motion of plaintiff MBTA for partial summary judgment filed in Civil No. H–90–1741 be and the same is hereby denied.