65 F.3d 166
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
BELLSOUTH TELESENSOR, Plaintiff-Appellant,
v.
INFORMATION SYSTEMS & NETWORKS CORPORATION, Defendant-Appellee,
v.
SYSTEMS MANAGEMENT FACILITIES, INCORPORATED; Cardkey
Systems, Inc., Third Party Defendants-Appellees.
BELLSOUTH TELESENSOR, Plaintiff-Appellee,
v.
INFORMATION SYSTEMS & NETWORKS CORPORATION, Defendant-Appellant,
v.
SYSTEMS MANAGEMENT FACILITIES, INCORPORATED; Cardkey
Systems, Inc., Third Party Defendants-Appellees.
 Nos. 92-2355, 92-2437.
 United States Court of Appeals, Fourth Circuit.
 Argued May 1, 1995.
Decided Sept. 5, 1995.
 
 ARGUED: Francis Joseph Nealon, BALLARD, SPAHR, ANDREWS & INGERSOLL, Washington, DC, for Appellant. David Vincent Anthony, PETTIT & MARTIN, Washington, DC, for Appellees. ON BRIEF: Marianne P. Eby, Constantinos G. Panagopoulos, BALLARD, SPAHR, ANDREWS & INGERSOLL, Washington, DC, for Appellant. Patricia A. Wentworth, PETTIT & MARTIN, Washington, DC, for Appellees.
 Before WIDENER, LUTTIG, and WILLIAMS, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 In this diversity jurisdiction case applying Maryland law, BellSouth TeleSensor (BellSouth) appeals the district court's judgment, following a bench trial, finding that Information Systems & Networks Corporation (ISN) effectively revoked its acceptance of computer goods that ISN had agreed to purchase from BellSouth to satisfy ISN's contract with the Navy for a security system. For the reasons that follow, we affirm the district court's judgment on this issue and also on several other rulings BellSouth has alleged as error; however, we dismiss that portion of the appeal challenging the denial of BellSouth's motion for summary judgment.
 
 I.
 
 2
 We review the district court's findings of fact from a bench trial for clear error. Crawford v. Air Line Pilots Ass'n Int'l, 992 F.2d 1295, 1297 (4th Cir.) (en banc), cert. denied, 114 S.Ct. 195 (1993); see also Owens-Illinois, Inc. v. Aetna Casualty & Sur. Co., 990 F.2d 865, 870 (6th Cir.1993) ("[T]he appellate court must review the facts in the light most favorable to the present appellee."); American Football League v. National Football League, 323 F.2d 124, 134 (4th Cir.1963) ("[W]e view the evidence most favorable to ... the District Court's finding....").
 
 
 3
 In December 1987, the United States Navy awarded ISN a contract to develop and install an electronic security system at four Navy bases in the United States and abroad. ISN, in turn, subcontracted with BellSouth to provide the security system's Monitor & Control System (M & CS), which was jointly manufactured by third-party defendants Systems Management Facilities (SMF) and Cardkey Systems, Inc. (Cardkey), using capital provided by BellSouth. The M & CS is a major component of the overall security system.[1] After several demonstrations of the proposed M & CS, ISN and BellSouth entered into a contract for four of them.[2] In response to this agreement, BellSouth entered into a separate contract with SMF and Cardkey to refine and develop the M & CS. However, SMF and Cardkey each were still developing the component parts of the M & CS for which they were responsible.
 
 
 4
 In August 1989, SMF and Cardkey began shipping parts of the M & CS to ISN. Because BellSouth was solely an intermediary, it never inspected the parts that were shipped or their condition.[3] Only after it sent an employee to ISN to inventory the parts did BellSouth learn that the shipments of SMF and Cardkey parts were incomplete. As the district court noted:
 
 
 5
 There is no question ... that these goods were nonconforming [to the contract] at the time the tender of delivery was made....
 
 
 6
 Clearly, as a matter of fact, S.M.F.'s people themselves admitted, both in testimony here and in a number of the exhibits, that there were parts of the firmware that didn't work right; there were interfaces that hadn't been developed yet; [and] there were some hardware problems with the conformal coating.
 
 
 7
 (J.A. 617). The goods, as delivered, did not conform to Navy specifications as the contract between BellSouth and ISN required.
 
 
 8
 Although it did not return the goods to BellSouth, ISN immediately started working with BellSouth, SMF, and Cardkey to bring the goods into conformity. For instance, in November 1989, Tobe Henry, an SMF employee, travelled to ISN's Charleston, South Carolina, headquarters to identify the extent to which the M & CS failed to meet Navy specifications. In certain cases, the deficiencies consisted of software that SMF and Cardkey had not yet developed, and in many other cases, the causes of certain deficiencies could not be identified because they were masked by other problems. The same month, ISN attempted to demonstrate the security system to the Navy. The Navy immediately reported to ISN and SMF that the system did not comply with Navy specifications. ISN scheduled another demonstration for the Navy in January 1990.
 
 
 9
 On December 21, 1989, BellSouth wrote to ISN "to confirm BellSouth TeleSensor's assurance that the IBM and Cardkey equipment and software will be operational prior to [ISN's] January demonstration to [the Navy]." (J.A. 1021). Notwithstanding these assurances, ISN still considered BellSouth "in default" of their agreement (J.A. 1023(f)), and subsequently cancelled the January demonstration for the Navy.
 
 
 10
 On March 22, 1990, ISN sent BellSouth a five-page list of twenty-five problems with the M & CS and related hardware. Five days later, representatives of ISN and BellSouth met at ISN's Bethesda, Maryland headquarters "to resolve issues with the purchase order; determine a schedule of when the hardware and software will be corrected to meet the specifications of the purchase order, to resolve the payment schedule, and implementation of [the] purchase order for the remaining sites." (J.A. 1055(a)).
 
 
 11
 Finally, on May 10, 1990, representatives of BellSouth, ISN, and SMF met in Charleston. A letter from Richard H. Kelly, Jr., BellSouth's director of marketing, to ISN's Gerald Hood memorialized the meeting:
 
 
 12
 Pursuant to our meeting today, May 10, 1990, the purpose of this correspondence is to confirm the items discussed concerning requirements for payment to BellSouth TeleSensor for hardware and software stated on invoice # XS93305 in the amount of $727,714.23.
 
 
 13
 BellSouth TeleSensor Agrees [sic] to furnish SMF Inc. and BellSouth TeleSensor Personnel to correct the following items by May 31, 1990.
 
 1. Cardkey/AM84 Alarm Response Processing
 
 14
 2. Color Graphic--Resync--High Security-Alarms
 
 3. Video Monitoring Interface
 
 15
 4. Four State Alarm Reporting--AM 84 and STI.
 
 
 16
 5. One/Two Man Access--Masking Alarm.
 
 
 17
 6. Five lines with ten ports for looping.
 
 
 18
 Based on these items being corrected by May 31, 1990, ISN, Inc. agrees to make payment no later than June 4, 1990 for the above stated invoice in full.
 
 
 19
 (J.A. 1056). It is uncontested that, after this meeting, BellSouth and ISN attempted to fix the problems delineated in the letter.
 
 
 20
 ISN believed, however, and the district court found, that BellSouth failed to correct all six of the deficiencies by May 31, 1990. Therefore, ISN did not pay BellSouth for the M & CS. On June 6, 1990, BellSouth sued ISN for the contract price in the United States District Court for the District of Maryland. The Navy then cancelled ISN's contract for the four security systems on June 22, 1990. ISN filed a counterclaim for compensatory damages based on its time lost trying to repair the deficient M & CS and for incidental damages from the Navy's cancellation of its contract. Subsequently, BellSouth filed a third-party complaint against SMF, alleging that if the district court were to find ISN not liable to BellSouth, then SMF should be liable to BellSouth for the price paid on their contract. In turn, SMF filed its own third-party complaint against Cardkey.
 
 
 21
 On November 13, 1990, ISN sent BellSouth a letter "to provide formal notification to [BellSouth] that ISN is preparing to ship all equipment in its possession provided by [BellSouth] back to [BellSouth]." (J.A. 926). This notice further informed BellSouth that ISN was returning the goods because of their "failure to comply with applicable [Navy] specifications." Id. ISN returned the goods shortly thereafter.
 
 
 22
 After denying BellSouth's motion for summary judgment, the district court conducted a bench trial on September 22-25, 1992. During the course of trial, the district court also denied BellSouth's motion to amend its complaint pursuant to Fed.R.Civ.P. 15(b) to include SMF along with ISN as a direct defendant in the action, rather than as a contingent third-party defendant. At the conclusion of the trial, the district court ruled that neither BellSouth nor ISN was liable to the other, thereby necessarily ruling in favor of SMF and Cardkey. Specifically, it found that although BellSouth and ISN had entered into an agreement for the M & CS, ISN had timely revoked its acceptance of the M & CS because of its failure to conform to the Navy specifications. Additionally, the court found that BellSouth was not liable to ISN for damages resulting from the time spent developing the system or from the loss of the Navy contract. Because ISN did not recover from BellSouth, neither SMF or Cardkey was found liable. The court held that BellSouth and ISN should bear their own costs; however, it ordered BellSouth to pay costs to SMF and Cardkey.
 
 
 23
 Although both BellSouth and ISN filed notices of appeal, only BellSouth has pursued its appeal. Primarily, BellSouth argues that the district court erroneously found (1) that ISN satisfied the procedural requirements of U.C.C. section 2-608 and (2) that the nonconformities in the M & CS substantially impaired the contract between BellSouth and ISN. BellSouth also argues that (3) ISN waived revocation of acceptance as a defense by failing to plead it expressly; (4) the district court erroneously shifted the burden of proof to BellSouth on the issue of whether the contract was substantially impaired; and (5) the district court erred by not requiring ISN to present expert testimony on the issue of substantial impairment and by excluding testimony on ISN's motives for revoking its acceptance. Finally, BellSouth appeals the district court's award of costs to a third-party defendant and the court's denial of its summary judgment motion. We address these issues seriatim.
 
 II.
 
 24
 The parties agree, as do we, that this case is governed by Maryland law, and specifically by that portion of the Maryland Code of Com mercial Law adopting Article 2 of the Uniform Commercial Code (U.C.C.). See Md.Code Ann., Com. Law. I Sec. 2 (1992). The U.C.C. has its own unique set of rules governing contract formation and acceptance of tendered goods. See Secs. 2-201 to 2-210 (formation); Secs. 2-601 to 2-616 (acceptance of goods). Once parties have agreed to contract, unlike the common law, under the U.C.C. the seller of goods is required to deliver a perfect tender. See Sec. 2-601 (allowing rejection "if the goods or the tender of delivery fail in any respect to conform to the contract"). Under the perfect tender rule, all goods must exactly conform to the contract or the buyer has the option to reject them. Id.; Chlan v. KDI Sylvan Pools, 452 A.2d 1259, 1262 (Md.Ct.Spec.App.1982) ("The perfect tender rule in Sec. 2-601 may be eminently fair in commercial transactions for goods, where if one party does not receive precisely what he bargained for, he may reject and return the goods...."). If the buyer does not reject the nonconforming goods, however, he has accepted them. See Sec. 2-606(1)(a)-(b). And once the goods are accepted, the buyer can only revoke his acceptance if he satisfies the requirements of U.C.C. section 2-608. See Sec. 2-608(1)-(2).
 
 
 25
 As stated above, the district court found that after the May 10, 1990 letter, ISN had the right to revoke its acceptance of the goods under section 2-608(1)(a) when it determined that BellSouth did not seasonably cure the nonconformities of the M & CS. BellSouth raises several challenges to this finding. First, it argues that ISN did not comply with the procedural requirements of section 2-608 revocation. Second, it asserts that any nonconformities in the M & CS did not substantially impair the agreement, and therefore, ISN did not have the right to revoke. Finally, BellSouth contends that ISN's use of some M & CS equipment voided its ability to revoke its acceptance of the M & CS. For the reasons explained below, we disagree with all three contentions.
 
 A.
 
 26
 The central issue in this case is whether ISN effectively revoked its acceptance of the M & CS from BellSouth under section 2-608 of the Maryland Code of Commercial Law. The provision defines the narrow set of circumstances in which a buyer can revoke his acceptance.[4] "Under Sec. 2-608, [the buyer] could revoke acceptance if the nonconformity of the [good] substantially impaired its value to him and if he reasonably believed the nonconformity would be cured and it was not seasonably cured...." Mercedes-Benz of North America v. Garten, 618 A.2d 233, 242 (Md.Ct.Spec.App.1993). Section 2-608 also "requires that ... notice be given of the nonconformity in the goods materially impairing their value to the buyer ... within a reasonable time after the buyer discovers or should have discovered such nonconformity." Lynx, Inc. v. Ordnance Products, 327 A.2d 502, 513 (Md.1974). Questions of nonconformity, substantial impairment, and notice are questions of fact, Champion Ford Sales v. Levine, 433 A.2d 1218, 1222 (Md.Ct.Spec.App.1981) (nonconformity and substantial impairment); Lynx, 327 A.2d at 512 (notice), which we review for clear error. Fed.R.Civ.P. 52(a); Friend v. Leidinger, 588 F.2d 61, 64 (4th Cir.1978).
 
 
 27
 We conclude that ISN complied with the spirit, if not the letter, of section 2-608's procedural requirements. Without question, ISN accepted the goods with the expectation that nonconformities would be cured. See Sec. 2-608(1)(a). As the district court found, ISN, BellSouth, SMF, and Cardkey all worked continuously to bring the M & CS into conformity. It was only after the May 31, 1990 deadline[5] expired without the nonconformities having been corrected that ISN felt the need to revoke its acceptance in the November 13, 1990 letter. Notwithstanding BellSouth's objections, we believe that both the time and manner of ISN's revocation were acceptable under section 2-608.
 
 
 28
 Although mailed five months after BellSouth's May 31, 1990 deadline to cure, the November 13th letter was timely because, as the district court noted, BellSouth filed this action less than one week after the deadline, thereby obviating the necessity of an immediate revocation of acceptance on ISN's part. Furthermore, BellSouth knew that ISN continued to believe the goods were nonconforming from the moment it filed suit. Any official written notice, although helpful, merely would have reiterated that which BellSouth already knew. Therefore, we cannot say that the district court clearly erred in holding that the notice was timely given.
 
 
 29
 Similarly, the form of notice was not fatally defective. BellSouth argues that the Lynx decision requires ISN to specifically delineate the nonconformities in its notice. Brief of Appellant/Cross-Appellee at 24 (citing Lynx, 327 A.2d at 513). Section 2-608, however, does not require any magic words. The November 13th letter informed BellSouth that ISN was returning the goods because of "the equipment's failure to comply with applicable specifications." This notice, coupled with the stormy relations between the parties at the time it was sent, clearly informed BellSouth that ISN was returning the goods because of BellSouth's failure to comply with the letter of May 10, 1990. Cf. Cancun Adventure Tours v. Underwater Designer Co., 862 F.2d 1044, 1047 (4th Cir.1988) (holding, under Virginia's Commercial Code, that notice of rejection was sufficient where buyer communicated its dissatisfaction with the product and returned goods because the U.C.C. only requires the buyer "to notify the seller that the transaction is 'troublesome.' ").
 
 
 30
 Moreover, ISN's failure to plead revocation in its answer did not waive this defense. Contrary to BellSouth's reading of the Lynx decision, we find that the Maryland Court of Appeals held simply that a buyer must notify a seller of revocation before the buyer may assert revocation as an affirmative defense to a breach of contract claim. See 327 A.2d at 514. Although ISN did not specifically plead revocation of acceptance in its answer, it alleged that BellSouth was aware of the nonconformities that supported ISN's revocation of acceptance. Therefore, we agree with the district court that ISN was entitled to defend itself on the basis of revocation. See, e.g., Badger Produce Co. v. Prelude Foods Int'l, 387 N.W.2d 98, 104-05 (Wis.Ct.App.1986) (applying Wisconsin's version of the U.C.C. and noting that "[t]he issue is not whether [the buyer] pleaded revocation, but whether it pleaded facts which, if true, would constitute revocation.").
 
 B.
 
 31
 ISN was also entitled to revoke its acceptance because the nonconformities substantially impaired the value of its contract with BellSouth. Substantial impairment is a question of fact.
 
 
 32
 Whether a nonconformity substantially impairs the product's value to the buyer necessarily involves consideration of subjective factors, i.e., the particular needs and circumstances of the individual buyer, yet proof of substantial impairment requires more than the buyer's subjective assertion that the value of the product to him was impaired; it requires evidence from which the trier of fact, applying objective standards, can infer that the needs of the buyer were not met because of the nonconformity. Champion Ford Sales, 433 A.2d at 1222. Precisely because of the delicate factual nature of this issue, we must accord great deference to the district court's findings and reverse only where there is clear error. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).[6] The district court determined that BellSouth's failure to meet the Navy specifications substantially impaired the M & CS contract to ISN, in-and-of-itself. Based on the testimony of several witnesses, the court also determined, by a preponderance of the evidence, that BellSouth's failure to cure after the May 10th letter caused the M & CS's nonconformity with the Navy specifications. The court considered: (1) testimony of Tobe Henry, an SMF official familiar with the M & CS, who testified to the numerous discrepancies between the existing M & CS and the Navy specifications; (2) admissions by BellSouth's experts that these deficiencies were not cured by May 31, 1990; and (3) deposition testimony from SMF official Dennis Drews, who also confirmed that BellSouth had not cured the nonconformities by May 31, 1990. After reviewing the record, we are not left with the "definite and firm" conviction that the district court's finding was clearly erroneous.
 
 C.
 
 33
 Finally, ISN may still revoke its acceptance even though it used some of the M & CS equipment. Section 2-608(2) bars revocation when the buyer has "substantial[ly] change[d] the condition of the goods." Post-revocation use
 
 
 34
 will not invariably cancel revocation. The issue is determined on a case by case basis, with the reasonableness of post-revocation use being the underlying consideration, taken in conjunction with a consideration of all the other elements necessary to effect a justifiable revocation.
 
 
 35
 Ozark Kenworth, Inc. v. Neidecker, 672 S.W.2d 899, 903 (Ark.1984) (applying U.C.C. Sec. 2-608 under Arkansas law) (footnote omitted). We believe that the district court correctly determined that ISN's use of some of the M & CS equipment was de minimis at best. ISN admitted that it mixed and matched some parts of the machines and used the M & CS's desktop personal computers for some basic office functions. BellSouth contends that a buyer's extended use of goods precludes revocation, and cites several cases to that effect, see, e.g., Computerized Radiological Servs. v. Syntex Corp., 786 F.2d 72, 75-76 (2d Cir.1986) (holding that the buyer's extended use of a CAT scanner far longer than necessary to acquire a replacement invalidated attempt to revoke). Here, however, ISN used only a small component part of the M & CS for minor clerical and routine functions. Its slight use of the M & CS's personal computers was not overwhelming enough to effectively constitute an acceptance of the entire M & CS with its defects.
 
 
 36
 In sum, we find no clear error in the district court's holdings that ISN accepted the M & CS with the expectation of cure, the M & CS's defects substantially impaired the value of the entire contract between ISN and BellSouth, and ISN complied with the procedural aspects of section 2-608 to revoke its acceptance of the M & CS. Accordingly, we affirm the district court's finding that ISN effectively revoked its acceptance of the BellSouth M & CS.
 
 III.
 
 37
 BellSouth also raises several trial-related errors. First, it argues that the district court improperly shifted the burden of proof on the issue of substantial impairment from ISN to BellSouth. Second, BellSouth asserts that the court committed two evidentiary errors. Finally, BellSouth claims that the district court abused its discretion in denying BellSouth's motion to amend its complaint to include SMF as a defendant. We address these issues in turn.
 
 A.
 
 38
 BellSouth first argues that the district court impermissibly shifted the burden to BellSouth to show that the nonconformities did not sub stantially impair the contract instead of requiring ISN to prove that the nonconformities did substantially impair the agreement. We disagree.
 
 At trial, the district court stated:
 
 39
 [A]lthough it's true that on acceptance there is a shift in the burden of proof [to the Buyer] under # AD8E # 2-]607 to show nonconformity, if, in fact, this modification [the May 10th letter], if I find it to be a modification, recognizes the existence of a non-conformity, then it's [BellSouth's] burden to show that that non-conformity was cured.
 
 
 40
 (J.A. 609). Under U.C.C. section 2-607(4), the buyer bears the burden of showing a breach. Lynx, 327 A.2d at 513; see also In re Lone Star Indus., Concrete R.R. Cross Ties Litig., 776 F.Supp. 206, 224 (D.Md.1991); TEC Floor Corp. v. Wal-Mart Stores, 4 F.3d 599, 602 (8th Cir.1993) (applying Sec. 2-607(4) under Arkansas law). This burden, of course, would include showing that the product's defects substantially impaired the value of the goods to the buyer. See Lynx, 327 A.2d at 512-13; Olmstead v. General Motors Corp., 500 A.2d 615, 619 (Del.Super.Ct.1985); Gasque v. Mooers Motor Car Co., 313 S.E.2d 384, 388 (Va.1984) ("The buyer must carry the burden of proof on [the] issue [of substantial impairment] by a preponderance of the evidence."). Here, the district court found that ISN proved that the nonconformities substantially impaired the value of the contract because they prevented the M & CS from meeting the Navy specifications. Furthermore, BellSouth admittedly accepted responsibility for curing the M & CS's nonconformities in its May 10, 1990 letter to ISN. ISN therefore met its burden of showing substantial impairment.
 
 
 41
 The district court appropriately observed that if the letter established nonconformity, then BellSouth should bear the burden of showing a cure. In essence, proving that the M & CS's defects were cured was one of BellSouth's affirmative responses to ISN's claim of substantial impairment. In order to recover on its claim under the contract, BellSouth must bear the burden of showing that its goods complied with the Navy specifications, and therefore, with the contract. Accordingly, we affirm the district court's holding on this issue.
 
 B.
 
 42
 In determining whether the SMF systems for which BellSouth and ISN had contracted were nonconforming, the district court preferred ISN's lay testimony to that of BellSouth's experts. The court held that in a bench trial, it was within the court's discretion to decide whether expert testimony was necessary. BellSouth contends that the district court could not have determined that the M & CS were nonconforming without requiring ISN to present expert testimony. Because this is an evidentiary issue, we review for abuse of discretion. See Power v. Arlington Hosp. Ass'n, 42 F.3d 851, 866 (4th Cir.1994).
 
 
 43
 This Circuit, like other courts, gives broad discretion to trial judges sitting as fact finders to weed through expert and lay testimony to find the truth. See Sparks v. Gilley Trucking Co., 992 F.2d 50, 53 (4th Cir.1993) ("Whether to allow expert testimony ... [is a] question[ ] committed to the discretion of the trial judge...."). The Supreme Court similarly has noted that in jury trials
 
 
 44
 expert testimony not only is unnecessary but indeed may be properly excluded in the discretion of the trial judge "if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them [as the experts]."
 
 
 45
 Salem v. United States Lines Co., 370 U.S. 31, 35 (1962) (quoting United States Smelting Co. v. Parry, 166 F. 407, 411 (10th Cir.1909)).
 
 
 46
 The district court determined that the question of nonconformity was not complex enough to require expert testimony. The lay testimony given at trial made clear that anything failing to conform to the Navy specifications would render the M & CS unacceptable to the Navy and thus would substantially impair the contract. The gravamen of the substantial-impairment inquiry was whether certain response times satisfied the Navy specifications. The district court was capable of comprehending, without the aid of experts, whether the response times of the M & CS, as testified to at trial, matched those the Navy required. Furthermore, BellSouth's own expert testimony was inconclusive, and therefore, did not require rebuttal from an expert witness. We recognize that this is a technical field, and therefore, probably a somewhat close call; however, we certainly cannot say that the district court abused its discretion.
 
 
 47
 Contrary to BellSouth's second evidentiary challenge, we also do not believe that the district court abused its discretion by excluding testimony about ISN's motives for revoking its acceptance. At trial, BellSouth's attorney attempted to "proffer ... that ISN didn't pay BellSouth Telesensor because it knew it was facing termination by the Navy. [ISN's failure to pay BellSouth] was unrelated to the alleged defects." (J.A. 563). The district court ruled that ISN's motives were irrelevant to the questions of whether the revocation was timely and whether a defect substantially impaired the contract.
 
 
 48
 We agree with the district court that the U.C.C. is an "intent-neutral" statute. The U.C.C. is silent about a buyer's motive or intent in rejecting nonconforming goods, and under the Code's perfect tender rule and other related rejection doctrines, so long as the goods are nonconforming and the parties act in good faith regarding the nonconformities, the buyer can reject the goods. See, e.g., Macon-Bibb County Water & Sewerage Auth. v. Tuttle/White Constructors, 530 F.Supp. 1048, 1054 (M.D.Ga.1981) ("The motive or state of mind of the defaulting party is irrelevant...."). Here, there is no evidence that ISN acted in bad faith or deliberately attempted to ambush BellSouth's attempts to cure; therefore, the only issues at trial were whether the goods were nonconforming, whether the nonconformities substantially impaired the value of the contract, and whether the procedural hurdles of section 2-608 were met. Thus, we believe that it was within the district court's discretion to exclude testimony about ISN's allegedly sinister motives for revoking its acceptance of the M & CS.
 
 C.
 
 49
 After the submission of its case, BellSouth made a motion to amend its pleadings pursuant to Fed.R.Civ.P. 15(b) to make SMF a defendant in its suit, rather than merely a third-party defendant to ISN's counterclaim. The district court denied this motion for two rea sons. First, it noted that BellSouth's complaint against SMF requested relief from SMF only if ISN's counterclaim were successful. Second, it acknowledged that this amendment would have an extremely prejudicial effect because SMF had cooperated with BellSouth in many ways and a last-minute change to an adversarial relationship would cause SMF great harm. (J.A. 600). We review a Rule 15(b) denial for abuse of discretion. American Hot Rod Ass'n v. Carrier, 500 F.2d 1269, 1275 (4th Cir.1974).
 
 
 50
 Rule 15(b) allows parties to amend their pleadings to conform to the evidence presented at trial if the parties expressly or impliedly agreed to try the unpleaded issue. Winant v. Bostic, 5 F.3d 767, 773 (4th Cir.1993). Additionally, the district court may deny a Rule 15(b) amendment if surprise or prejudice to the opposing party by virtue of allowance of the amendment would result. See id. Although SMF was on notice that it could be held liable if ISN were to prevail on BellSouth's claim, it rightfully maintains that it did not prepare or conduct its trial strategy with a view toward defending a direct action against it by BellSouth. In fact, BellSouth did not move to amend until after all witnesses had been examined and both parties had presented their cases. The district court specifically found that "manifest prejudice would result to S.M.F. from allowing an amendment of the third-party claim here so as to turn it into an affirmative claim for relief rather than one in the nature of indemnity." (J.A. 600). Under the facts presented, we agree that SMF would have suffered severe prejudice and, accordingly, cannot conclude that the district court abused its discretion in denying the motion to amend.
 
 IV.
 
 51
 The district court ordered BellSouth and ISN to bear their own costs; however, it awarded costs to third-party defendants SMF and Cardkey as prevailing parties against BellSouth. BellSouth asserts that although Cardkey was a prevailing party, it was not a prevailing party against Bellsouth, but rather against SMF--the party that brought Cardkey into the suit by filing a third-party complaint against Cardkey. Therefore, BellSouth claims that the district court abused its discretion in awarding Cardkey costs pursuant to Fed.R.Civ.P. 54(d).[7] We disagree.
 
 
 52
 Without question, Cardkey was brought into this suit only because of BellSouth's action against SMF. Cardkey and SMF jointly developed the M & CS, and they had a common interest in defending SMF against BellSouth's claims for indemnity. The precedent on this issue is sparse; however, we find persuasive a case cited by Cardkey, American State Bank v. Pace, 124 F.R.D. 641 (D.Neb.1987). There, American State Bank sued the defendant, who brought in the third-party defendant. Both defendants prevailed against American State Bank, and the district court ordered American State Bank to pay costs to the third-party defendant. Like BellSouth, American State Bank argued that it was improper to award costs to the third-party defendant because it did not sue the third-party defendant. The district court disagreed, holding that "costs are assessed for assertion of a defense by the third-party defendant against the plaintiff, having nothing to do with respect to the action between the defendant and the third-party defendant." Id. at 650.
 
 
 53
 Similarly, Cardkey incurred its costs not by defending a distinct suit against it by SMF, but by defending its common interests with SMF against BellSouth's third-party claim against SMF. Accordingly, we find no abuse of discretion in ordering BellSouth to pay Cardkey's costs under Rule 54(d) and affirm the district court's order.
 
 V.
 
 54
 Finally, BellSouth argues that the district court erred in denying its pre-trial motion for summary judgment. Specifically, it claims that ISN failed to create a material issue of fact by providing enough evidence to rebut BellSouth's proffers under Fed.R.Civ.P. 56(c). However, we must reject this claim. As we recently held in Chesapeake Paper Products Co. v. Stone & Webster Engineering Corp., 51 F.3d 1229 (4th Cir.1995), we "will not review, under any standard, the pretrial denial of a motion for summary judgment after a full trial and final judgment on the merits." Id. at 1237. Pursuant to this standard, after a case goes to trial, we cannot review any allegation that summary judgment was appropriate before trial because there was purportedly no genuine issue of material fact at that time. Accordingly, we dismiss this portion of the appeal.
 
 VI.
 
 55
 For the foregoing reasons, we affirm the judgment of the district court on all grounds and dismiss that portion of the appeal challenging the district court's pretrial denial of summary judgment to BellSouth.
 
 
 56
 AFFIRMED IN PART, DISMISSED IN PART.
 
 
 
 [1]
 ISN described the M & CS as follows:
 The M & CS is the control core of any intrusion detection system. It consists of redundant processors, peripherals, printers and color graphics, video terminals and communication links that tie the peripheral devices into the central processors. Complex software is required to control the precise and timely operation of the system's many components. The M & CS must reliably, accurately, and quickly inform the operator via various displays and alarms if any unauthorized or forceful entry is detected or when any element of the intrusion detection system is malfunctioning or is being deliberately tampered with. Failure of the M & CS to operate in accordance with the Navy specifications can jeopardize the safety of personnel and the valuable assets located at the Navy site.
 See Brief of Appellee/Cross-Appellant at 2 (Joint Appendix citations omitted).
 
 
 [2]
 The district court determined that this contract was formed through a June 8, 1989 letter of intent. Although ISN disputed the existence of a contract in the court below, on appeal, both parties concede that the letter of intent formed a contract. See Brief of Appellee/Cross-Appellant at 4
 
 
 [3]
 It was estimated that the total volume of parts shipped to ISN during this period would fill a tractor-trailer truck; many parts had been shipped without packing slips
 
 
 [4]
 Section 2-608 reads:
 Revocation of acceptance in whole or in part.
 (1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it
 (a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or
 (b) Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
 (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
 (3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.
 Md.Code Ann., Com. Law. I Sec. 2-608 (1992).
 
 
 [5]
 The May 10th letter established the May 31, 1990 deadline for BellSouth to cure the nonconformities. The district court found that this letter, memorializing the meeting at which BellSouth agreed to correct certain problems with the M & CS, was a formal contractual modification to the contract between BellSouth and ISN. We need not reach this issue, however, because even if the contract was not modified, we believe that this letter serves as sufficient indicia of the parties' intent to cure the nonconformities and demonstrates what the parties thought would be a seasonable time to cure under the cure provisions of U.C.C. Sec. 2-508, the revocation provisions of U.C.C. Sec. 2-608, and the general provisions for good faith in commercial transactions of U.C.C. Secs. 1-203 and 2-103(1)(b)
 
 
 [6]
 As one court has stated: "To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must ... strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." Parts & Elec. Motors v. Sterling Elec., 866 F.2d 228, 233 (7th Cir.1988), cert. denied, 493 U.S. 847 (1989)
 
 
 [7]
 Federal Rule of Civil Procedure 54(d) reads in pertinent part:
 Costs Other than Attorneys' Fees. Except when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs....
 Fed.R.Civ.P. 54(d)(1).